IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 4, 2003

## TERRELL BURGESS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. P22629      Chris Craft, Judge**

_____

**No. W2002-00826-CCA-R3-PC  - Filed July 2, 2003**

_____

The petitioner, Terrell Burgess, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief from his guilty pleas to first degree felony murder, aggravated robbery, and two counts of aggravated assault and his resulting effective sentence of life plus ten years in the Department of Correction (DOC). He contends (1) that he received the ineffective assistance of counsel and (2) that his attorney coerced him into pleading guilty. We affirm the trial court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

Robert Little, Maplewood, New Jersey, for the appellant, Terrell Burgess.

Paul G. Summers, Attorney General and Reporter; P. Robin Dixon, Jr., Assistant Attorney General; William L. Gibbons, District Attorney General; James Morton Lammey, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the kidnapping and killing of Dorothy Webber. The petitioner was originally charged with first degree felony murder during the perpetration of a kidnapping, especially aggravated kidnapping, especially aggravated robbery, and two counts of aggravated assault. During his trial, the petitioner accepted a plea offer from the state, and the trial court held a guilty plea hearing. The state gave the following account of the crimes: In the early morning hours of August 12, 1995, the petitioner and two codefendants arrived at 2316 Clearpark in Memphis dressed in Krispy Kreme Donut Company uniforms. They engaged Ms. Webber in a conversation and entered her home. The three pointed guns at Ms. Webber, Leslie Webber, Jr., and Leslie Webber, Sr., whom they also struck with a gun. They put Ms. Webber into her Toyota Camry and drove her to TK's Tire Store. They then moved her to the Elvis Presley Inn and back to the tire store. The next day, the

defendant and three other people drove to Mississippi and left Ms. Webber's body by a small farming road in DeSoto County. The state told the trial court that Dr. O. C. Smith would have testified at trial that the victim was suffocated by heavy duct tape that had been placed over her nose.

The petitioner filed a petition for post-conviction relief, claiming that he received the ineffective assistance of counsel because his attorney did not prepare adequately for trial, improperly advised him about his release eligibility from the DOC, and did not challenge venue. In addition, he claimed that his attorney coerced him into pleading guilty by having a codefendant's attorney talk to him about the strength of the state's case and by showing him gruesome photographs that would have been inadmissible at trial.

At the evidentiary hearing, the petitioner testified that he requested copies of the indictment, arrest warrant, police report, preliminary hearing transcript, and autopsy report from his attorney, which were never provided. He said, though, that his attorney gave him copies of his and his codefendants' statements to the police. He said that his attorney never challenged venue and that his attorney should have done so because the state never established that the victim was killed in Tennessee.

The petitioner testified that Sergeant Dwight Woods told him that he would be convicted of manslaughter and receive a ten-year sentence if he cooperated and gave a statement. He said that because Sgt. Woods was also an African-American, he trusted him and gave the statement. He said that he told his attorney about this and wanted Sgt. Woods subpoenaed to a hearing on a motion to suppress his statement. He said that his attorney did not call Sgt. Woods to testify and objected when the state subpoenaed Sgt. Woods as a witness. He said that his attorney was unprepared for trial because the attorney did not get discovery, did not investigate the charges against him, and went into court "barehanded."

The petitioner testified that his attorney went over the facts of the case and his and the codefendants' statements with him. He said that his attorney made motions on his behalf and gave him copies of the motions. He said that his attorney discussed the state medical examiner's testimony with him and asked a former medical examiner to rebut that testimony. He said that at the beginning of trial, his attorney showed him photographs of the victim's badly decomposed body and implied that the photographs would be used as evidence against him. He said he never discussed the admissibility of the photographs with his attorney and was not aware if his attorney made any motions to suppress the photographs.

The petitioner testified that the state was seeking the death penalty. He said that although the state offered to let him plead guilty in exchange for a sentence of life without the possibility of parole, he decided to go to trial. He said that his attorney stopped the trial twice in order to try to convince him to plead guilty. He said that on the first occasion, his attorney introduced him to Coleman Garrett and Kevin Reed, his codefendants' attorneys, and commented that because Mr. Garrett was African-American, the petitioner might believe Mr. Garrett's opinion about the evidence. The petitioner testified that Mr. Garrett told him he had not known the state had as much damaging

evidence as it did. He said that Mr. Garrett's comments had a slight impact on him but that he decided to continue with the trial.

The petitioner testified that his attorney stopped the trial again before the state medical examiner testified and presented him with a new plea offer of life with the possibility of parole plus ten years. He said that he refused the offer and that his attorney got angry, began banging on a conference room table, and stated that he did not want to go to his grave knowing that the petitioner got the death penalty. He said that his attorney left the room to speak with the petitioner's family and that Patsy Webber, the defense's jury consultant, entered the room to calm things down. He said that his attorney showed his father some gruesome photographs of the victim's body and told his father that the petitioner would get the death penalty if the jury saw the photographs. He said that his father began pressuring him to accept the plea offer. He said his father told him that the plea was a blessing and that if he did not accept it, it would be like slapping his father in the face. He said that he was mentally stressed, that he felt like his attorney and his family had turned against him, and that he decided to accept the state's offer.

The petitioner testified that his attorney spent only one or two minutes reviewing the plea offer with him. He said that his attorney said he would serve twenty-five years at thirty percent for the life sentence and thirty percent of the ten-year sentence. He said he did not compute how much time he would actually serve when he entered the plea but thought he would serve twenty-five years before becoming eligible for parole. He said that while he was in prison, he learned that he would serve a minimum of fifty-one years for the murder conviction. He said that he lied during the guilty plea hearing when he told the trial court that he understood what he was doing.

On cross-examination, the petitioner acknowledged that he was under oath at the guilty plea hearing and that he swore to tell the truth. He also acknowledged testifying at the hearing that the victim died in Tennessee. He said that he lied at the hearing because, "in so many words," his attorney told him to. He said that his attorney told him that his testimony had to match the state medical examiner's testimony in order to get the sentence in the plea offer. He acknowledged that as a result of accepting the plea offer, three or four charges against him were dismissed. On redirect, the petitioner testified that his mind was "foggy" during the guilty plea hearing and that he felt frustrated and deprived of his jury trial.

The petitioner's trial attorney testified that he had been a defense attorney for thirty-seven years, had practiced criminal law for the past twenty or twenty-five years, and was retained by the petitioner's father. He said that he had tried four or five capital cases and at least twenty murder cases. He said that the state indicted the petitioner on eight counts but that the petitioner pled guilty to four and the others were dismissed. He said that he initially thought the state's case would not support a death penalty conviction but that as he learned more about the state's theory and obtained discovery, he saw a strong case with a high probability of conviction and the imposition of the death penalty.

The petitioner's attorney testified that he visited the petitioner several times in jail before trial. He said he obtained discovery and mailed a copy of everything to the petitioner and the petitioner's father. He said that even if the petitioner did not have a copy of the indictment, he told the petitioner about the charges. He said that he thought he provided a copy of the autopsy report to the petitioner but that he might be wrong. He said that in his meetings with the petitioner, they went over the petitioner's and codefendants' statements and that they discussed the suppression hearing. He said that they also discussed venue and that he told the petitioner venue was not an issue because the crime began in Tennessee.

The petitioner's attorney testified that he and the petitioner talked about the state medical examiner's testimony, which would be that the victim was dead when her body was dumped in Mississippi and that the victim's death took a period of time, qualifying it as an especially heinous crime. He said that he told the petitioner that Dr. Charles Harlan agreed to listen to the state medical examiner's testimony and provide rebuttal testimony if possible. He said that Dr. Harlan later told him that he could not rebut the medical examiner's assessment of the time of death, among other things. He said that he and the petitioner discussed the petitioner taking the stand and that the state would have used the petitioner's pretrial statement to the police against him. He said that the petitioner was mistaken about the photographs of the victim and that the trial court had ruled that some of them could not be shown to the jury at trial. He said, though, that some of the photographs may have been admissible at the petitioner's sentencing hearing. He said he showed those photographs to the petitioner's father.

The petitioner's attorney testified that he and the petitioner spoke throughout the trial and that he never tried to mislead the petitioner or his father. He admitted telling the petitioner that he did not want to go to his grave knowing that the petitioner had gotten the death penalty, but he said he was only trying to save the petitioner's life. He said he advised the petitioner that the petitioner was going to be convicted and probably sentenced to death. He said that he had tried the case all week before the guilty plea hearing, that the state had one more witness to examine before ending its proof, and that he had no witnesses to call other than the petitioner.

The petitioner's attorney testified that he discussed the sentence with the petitioner and never told the petitioner that the life sentence would be served at thirty percent. He said the petitioner must have confused the life sentence with the ten-year sentence, which the petitioner would serve at thirty percent. He said that he told the petitioner he did not know how much time the petitioner would have to serve for the life sentence but that it was "certainly up around fifty years." He said he approached the state about a plea and never told the petitioner to lie at the guilty plea hearing.

On cross-examination, the petitioner's attorney acknowledged that he approached the petitioner repeatedly to discuss a plea. He said that the petitioner did not want to plead guilty and that he asked Coleman Garrett to talk to the petitioner. He said he did a good job at trial and cross-examined the state's witnesses as well as anyone could have. He said that the defense was "getting killed" at trial, that he gave the petitioner his opinion about the case, and that the petitioner decided

to plead guilty. He said the petitioner was a very stoic and quiet person, who spoke deliberately and seriously. He said the petitioner understood what was going on during the guilty plea hearing.

The petitioner's attorney testified that he told the petitioner there was a possibility of getting out of prison with a life sentence but that there would be no chance of release with a sentence of life without parole. He said that he told the petitioner that not all of the photographs would be admitted into evidence but that the ones that were admitted would hurt the petitioner's case. He said that gruesome photographs were admitted into evidence before the petitioner pled guilty and that he did not show any of the photographs to the petitioner when they discussed the guilty plea.

Joseph Amos, the petitioner's father, testified that he was present throughout the trial and that he attended his son's guilty plea hearing. He said he hired the petitioner's attorney to represent his son for $10,000, to be paid as $5,000 up front and $5,000 at the end of the trial. He said that during the trial, the petitioner's attorney telephoned and asked for more money but that he refused to pay any additional money until the attorney finished the case.

Mr. Amos testified that he thought it was peculiar that the state had two attorneys whereas the petitioner's attorney represented the petitioner with only the aid of a jury consultant. He said that during the trial, the petitioner's attorney asked him to speak with the petitioner about accepting a plea offer because a life sentence would be better than a death sentence and because the petitioner was being a "dumbass" for refusing to plead guilty. He said that the petitioner's attorney showed him some gruesome photographs, which influenced him to persuade the petitioner to plead guilty. He said he told the petitioner that if he were on the jury and saw the photographs, he would give the petitioner the death penalty. He said the photographs showed a mostly nude body that was swollen from the sun and had several "eruptions" on it. He said the petitioner's attorney led him to believe that the jury definitely would see the photographs. He said the petitioner still refused to accept a plea offer at that time.

Mr. Amos testified that on three occasions during the trial, the petitioner's attorney talked with the petitioner about pleading guilty but that the petitioner still refused. He said that on the fourth day of trial, the petitioner's attorney showed the gruesome photographs to the petitioner. He said that Ms. Webber, the jury consultant, then spoke privately with the petitioner and that the petitioner accepted the plea offer. He said the petitioner seemed to be pleading guilty in response to pressure and in order to please his family. He said he and the petitioner's attorney coerced the petitioner into pleading guilty. He said he thought the petitioner's attorney wanted the petitioner to plead guilty in order to expedite the case.

On cross-examination, Mr. Amos acknowledged that numerous people counseled and gave the petitioner advice about the guilty plea. He said that when his son accepted the plea offer, the trial was almost over and the petitioner's attorney had pretty much done his job. He said that at the time, he was glad the petitioner had pled guilty and avoided the death penalty.

In denying the petition for post-conviction relief, the trial court expressly accredited the trial attorney, who testified at the evidentiary hearing that he received discovery, gave copies of discovery to the petitioner and the petitioner's father, cross-examined the state's witnesses, and hired a jury consultant and forensics expert for the petitioner's trial. The trial court determined that the attorney was thoroughly prepared for trial and did an excellent job. The trial court also accredited the attorney's testimony that he never told the petitioner that the petitioner would serve the life sentence at thirty percent. In addition, the trial court noted that it informed the petitioner at the guilty plea hearing that his sentence would be "life plus ten years in the state penitentiary" and that it never told the petitioner he would be eligible for release after serving thirty percent of that sentence. Regarding the petitioner's claim that his attorney should have contested venue, the trial court held that there was no merit to the issue because the proof showed that an element of the felony murder, i.e., the kidnapping, took place in Shelby County.

As to the petitioner's claim that he was coerced into pleading guilty by his attorney's having another attorney talk to him about the state's evidence, the trial court noted that Coleman Garrett did not testify at the evidentiary hearing and that, in any event, the petitioner had failed to show how Mr. Garrett's talking to him rendered his guilty plea invalid. Regarding the petitioner's claim that his attorney coerced him into pleading guilty by showing him inadmissible, gruesome photographs of the victim, the trial court noted that no hearing on the photographs was ever held during the trial; that the petitioner pled guilty before the state medical examiner, who had taken the photographs, testified; and that the petitioner had failed to make the photographs part of the post-conviction record. As a result, the trial court ruled that the petitioner had failed to demonstrate that the photographs would have been inadmissible and, therefore, that his attorney improperly used them to persuade the petitioner to plead guilty.

In order for a petitioner to succeed on a post-conviction claim, the petitioner must show the allegations set forth in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f). A trial court's findings of fact in a post-conviction hearing are conclusive on appeal unless the evidence in the record preponderates against those findings. See Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990). This court may not reweigh or reevaluate the evidence, nor substitute its inferences for those drawn by the trial court. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Questions concerning the credibility of witnesses and the weight and value to be given to their testimony are resolved by the trial court, not this court. Id. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. Tenn. Code Ann. § 40-30-203.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

The petitioner contends that he received the ineffective assistance of counsel because his trial attorney failed to prepare for trial adequately, improperly advised him that he would serve his life sentence at thirty percent, and did not object to venue. The state contends that the petitioner received the effective assistance of counsel. We agree with the state.

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72, 113 S. Ct. 838, 842-44 (1993). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. See Hellard, 629 S.W.2d at 9; DeCoster, 487 F.2d at 1201. On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

Regarding the petitioner's argument that his attorney did not prepare adequately for trial, the trial court accredited the trial attorney's testimony and ruled that the petitioner was well-represented at trial. We also note that the petitioner never claimed at the evidentiary hearing that his attorney's inadequate trial preparation caused him to plead guilty. To the contrary, he claims that his attorney coerced him into pleading guilty. Thus, the petitioner has failed to show that his attorney's performance was deficient or that any deficiency affected the outcome of his case. As to his argument that his trial attorney improperly advised him about his sentence release eligibility, the trial court again accredited the attorney, who testified that he never told the petitioner he would be eligible for release after serving only thirty percent of his life sentence. The petitioner has failed to show that he received the ineffective assistance of counsel.

Regarding the petitioner's claim that his attorney was ineffective for failing to challenge venue, Tenn. Code Ann. § 39-11-103(c) provides that when an offense begins in Tennessee and is completed in another state, venue lies in the county where the offense began. See also Tenn. R. Crim. P. 18(d) (providing that offenses "committed wholly or in part outside the state, under circumstances that give this state jurisdiction to prosecute the offender, may be prosecuted in any

county in which an element of the offense occurs"). In this case, the petitioner was charged and pled guilty to first degree felony murder during the perpetration of a kidnapping. At the guilty plea hearing, the state's presentation of the facts revealed that the petitioner kidnapped the victim from her home in Shelby County, Tennessee. Thus, the petitioner's attorney correctly advised him that venue for the first degree felony murder charge was proper in Shelby County, regardless of where the victim was killed.

## II. KNOWING, INTELLIGENT, AND VOLUNTARY PLEAS

Next, the petitioner claims that he was coerced into pleading guilty because his trial attorney used a codefendant's attorney to influence him and showed him gruesome, inadmissible photographs of the victim. The state claims that the petitioner has failed to show that his guilty pleas were coerced. We agree with the state.

In order for a conviction based upon a guilty plea to comport with due process, the plea must be voluntarily, knowingly, and understandingly entered. Boykin v. Alabama, 395 U.S. 238, 242-44, 89 S. Ct. 1709, 1712 (1969). A guilty plea is not voluntary "if it is the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . .'" Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting Boykin, 395 U.S. at 242-43, 89 S. Ct. at 1712). The standard for assessing the validity of a guilty plea is "'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" Id. (quoting North Carolina v. Alford, 400 U.S. 25, 31, 91 S. Ct. 160, 164 (1970)). "[T]he record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e., that he has been made aware of the significant consequences of such a plea; otherwise, it will not amount to an 'intentional abandonment of a known right.'" State v. Mackey, 553 S.W.2d 337, 340 (Tenn. 1977). To assess whether a petitioner entered a knowing, voluntary, and intelligent guilty plea, this court must consider the totality of the circumstances. State v. Turner, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995).

The petitioner testified that his attorney asked Coleman Garrett, a codefendant's attorney, to talk with him and that Mr. Garrett told him the state had damaging evidence against him. However, the petitioner also testified that Mr. Garrett's statements had a small impact on him and that he decided to continue with his trial. Thus, the petitioner has failed to show that his attorney's use of Mr. Garrett resulted in his guilty plea. As to the photographs, the trial court noted that the petitioner did not include the photographs in the record and failed to show that they would have been inadmissible at trial. Therefore, it determined that the petitioner had failed to demonstrate that his attorney's use of the photographs in order to get him to plead was improper. We believe that the evidence does not preponderate against the trial court's findings. Neither the photographs nor a transcript of any hearing on their admissibility has been included in the record on appeal. Thus, the petitioner has failed to show that his attorney's use of photographs to persuade him to plead guilty was improper.

We note that the law is well-settled that "a guilty plea is not rendered involuntary by the fact that the accused is faced with an election between a possible death sentence on a plea of not guilty and a lesser sentence upon a guilty plea." Bratton v. State, 477 S.W.2d 754, 757 (Tenn. Crim. App. 1971); Parham v. State, 885 S.W.2d 375, 381 (Tenn. Crim. App. 1994); see Alford, 400 U.S. at 31, 91 S. Ct. at 164; Hicks v. State, 983 S.W.2d 240, 248 (Tenn. Crim. App. 1998). In fact, in order for a defendant to make "'a voluntary and intelligent choice among the alternative courses of action' available to him, counsel must advise the accused, among other things, of the choices that are available to him as well as the probable outcome of these choices." Parham, 885 S.W.2d at 384 (quoting Alford, 400 U.S. at 31, 91 S. Ct. at 164). If an attorney believes it to be in the defendant's best interest to plead guilty, the attorney should advise the defendant to do so. Id. In so advising, the attorney may use reasonable persuasion to convince the defendant to accept his or her advice. Id. In this case, the petitioner's trial attorney believed that if the petitioner continued with the trial, the jury would convict him of first degree murder and impose the death penalty. Although the petitioner contends that he never wanted to plead guilty and was coerced, we note that he rejected all plea offers of life without the possibility of parole before trial, but after hearing nearly all of the state's proof, he agreed to plead to a sentence of life with the possibility of parole. Given the totality of the circumstances, the petitioner has failed to show that his guilty pleas were not knowingly, intelligently, and voluntarily entered.

Based upon the foregoing and the record as a whole, we affirm the trial court's denial of the post-conviction petition.

_____
JOSEPH M. TIPTON, JUDGE